## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| AMERICAN GENERAL LIFE INSURANCE COMPANY; and THE VARIABLE ANNUITY LIFE INSURANCE COMPANY,<br><br>         Plaintiffs,<br><br>      v.<br><br>PARETO SECURITIES INC.; and PARETO SECURITIES AS,<br>         Defendants. | Case No. 4:23-cv-4492<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs American General Life Insurance Company ("**AGL**") and The Variable Annuity Life Insurance Company ("**VALIC**," and together with AGL, "**Plaintiffs**"), by and through their undersigned counsel, for their Complaint against Defendants Pareto Securities Inc. ("**Pareto Inc.**") and Pareto Securities AS ("**Pareto AS**" and, together with Pareto Inc., "**Pareto**" or the "**Pareto Defendants**"), allege as follows:

### NATURE OF THE ACTION

1.      This is an action against Pareto for violations of the Texas Securities Act ("**TSA**"), Tex. Gov't Code §§ 4008.052, 4008.55.  In January 2019, Plaintiffs executed a Note Purchase Agreement ("**NPA**") to buy $75 million of 5.44% Senior Secured Notes, Series A, due December 31, 2038 (the "**Notes**").  The Notes were issued by GT USA Wilmington, LLC ("**GTW**"), and sold by Pareto as sole placement agent.  Pareto solicited Plaintiffs' purchase of, marketed, and sold the Notes to Plaintiffs, through their investment advisor, AIG Asset Management (U.S.), LLC ("**AAM**"),[1] in Houston, Texas.

---

[1] At all relevant times, Plaintiffs acted through their investment advisor, AAM.  For simplicity, references to the "Plaintiffs" shall include AAM unless otherwise specified.

2.      Pareto made a straightforward pitch to Plaintiffs:  GTW was a subsidiary of the largest independently-owned port operator in the world, Gulftainer Company Limited ("**Gulftainer**").  Through GTW, Gulftainer had won an exclusive, 50-year concession agreement (the "**Concession Agreement**") from the State of Delaware to operate the Port of Wilmington (the "**Port**"), as well as to build and operate a new container terminal called Edgemoor, a couple of miles up the Delaware River.  The Concession Agreement required GTW to make approximately $600 million in capital expenditures over the next ten years, and the Note proceeds would finance certain of those expenditures.  At the same time, GTW would take over ***all*** cargo operations at the Port, including its prized stevedoring/container handling operations,[2] which the State had previously outsourced to multiple third parties.  In other words, GTW was not only taking over an established customer and revenue base, but was also consolidating those operations into a single business that would eliminate costly redundancies and other inefficiencies.  GTW would use that immediate source of income, plus any additional income it generated as it expanded the Port and Edgemoor, to service the Notes.

3.       In late 2018 and early 2019, while Plaintiffs were considering the potential investment, they had a number of questions regarding the Notes.  The note offering documents expressly denied Plaintiffs access to GTW, requiring instead that Plaintiffs direct inquiries only to Pareto.  For its part, Pareto provided offering and sales materials, responded to numerous inquiries, and was in regular and frequent communication with Plaintiffs concerning GTW and its revenues, costs, and the Notes themselves.

---

[2]  "Stevedoring" is essentially the loading and unloading of cargo from a ship.  For purposes of this Complaint, stevedoring and container handling are used interchangeably.

4.      Critically, Pareto falsely represented to Plaintiffs that "***[GTW] will take over all***

***cargo operation at the [P]ort***," including, in particular, the operations of Murphy Marine Services

of Delaware, Inc. ("**MMS**"), the Port's primary stevedoring operator for more than forty years.

Thus, Pareto stated that GTW would take over all "***stevedoring revenue currently undertaken by***

***mainly MMS … of $48m***," and that, by consolidating operations, it would save more than $23

million in costs largely attributable to MMS.  Pareto provided financial materials to Plaintiffs that

modeled GTW's financials, including revenues and costs, incorporating those key assumptions

concerning nearly $50 million in annual stevedoring revenues and $23 million in cost reductions.

5.      Unfortunately for Plaintiffs, the representation that GTW was taking over all of the

Port's stevedoring operations and revenues was materially false and misleading.  In reality, two

months before Pareto first contacted Plaintiffs to solicit their investment, GTW had sabotaged its

financial future by ***repudiating*** its contract to acquire MMS (the "**MMS Contract**")—the very

contract through which GTW was to "take over" the Port's stevedoring operations.  Pareto not

only failed to disclose GTW's repudiation of the MMS Contract, but it also failed to disclose that

MMS had already filed suit against GTW for breach of the MMS Contract in the Delaware Court

of Chancery, exposing GTW to tens of millions of dollars in potential damages (the "**MMS**

**Action**").  In other words, the $70+ million upside touted by Defendants was more likely to be a

$20+ million downside.

6.      In reliance on these misrepresentations and omissions, among other things,

Plaintiffs purchased $75 million of the Notes.

7.      Shortly after the sale, GTW began to miss the rosy financial projections set forth in

the investment materials by wide margins, and it even defaulted on certain financial and other

covenants under the NPA.  By the end of 2019, instead of first-year revenues of $115 million and

an EBITDA of $35 million, GTW had generated only around half of those revenues ($61 million) for a ***negative*** EBITDA of minus $5 million.  Plaintiffs could not understand how the financial estimates would miss so badly, when those estimates had been based on steady historical streams of reliable stevedoring revenues which were purportedly being "take[n] over" by GTW.  Even when presented with these staggering misses, GTW and Pareto—who, quite unusually, continued to act on GTW's behalf and communicate for them for nearly a year after the Notes had been sold—offered only misleading excuses, including a refinery fire and delays in obtaining necessary equipment due to geopolitical issues and tariffs, which in turn delayed the implementation of cost-saving efficiencies and securing stevedoring revenues.  In other words, anything but the truth: that GTW had repudiated the MMS Contract and had been mired in the MMS Action since September 2018, preventing it from acquiring the majority of the Port's stevedoring operations and their attendant revenues and cost-savings.

8.     GTW's seismic financial shortfall doomed its ability to issue more notes or otherwise to raise any of the contemplated debt financing, which was the foundation of Plaintiffs' 20-year investment.  Pareto's marketing efforts indicated to Plaintiffs that the proceeds of the initial $100 million of Notes issued in 2019 would only satisfy a portion of its $600 million expenditure obligation under the Concession Agreement, and thus that an additional $500 million in debt financing would need to be raised over the life of the Notes.  An express condition of the Concession Agreement required GTW to invest at least $250 million in Edgemoor prior to the end of 2022 or it would lose the right to operate the Port altogether, rendering the Notes worthless.

9.     GTW could not raise additional debt because far from replicating historical revenues or reducing costs, GTW operated with the equivalent of an "IV drip" of liquidity.  Indeed, at a time when GTW and Pareto were supposed to be out showing steady and reliable revenues

sufficient to raise and service another $150 million of Notes, all GTW could show was a net loss of nearly $15 million and a negative EBITDA of minus $5 million.  Not only would no reasonable investor be interested in such an offering, but under the NPA, GTW's financial performance precluded it from incurring more debt given its ratio of existing debt to EBITDA.  GTW was later formally downgraded to a BB+, a non-investment grade rating, which prevented it from incurring additional debt.  Instead, GTW would resort to borrowing funds from friends and family overseas and funneling small amounts of cash to its immediate parent company, and then borrowing that money to stay alive.

10.     As Plaintiffs much later came to understand, the original representation that GTW would capture close to $50 million in stevedoring revenues depended on GTW's agreement to acquire MMS (along with its valuable customer contracts)—a binding agreement that GTW had repudiated and was the subject of ongoing litigation, none of which was disclosed to Plaintiffs when they were buying the Notes.

11.     Notably, in September 2022, the Delaware Chancery Court awarded MMS a $21 million judgment against GTW in the MMS Action.  With no realistic means of satisfying that judgment, let alone curing its ongoing defaults and Events of Default under the NPA, *and* just a few months away from materially defaulting under the Concession Agreement, GTW commenced a year-long restructuring effort with representatives of the State of Delaware and Plaintiffs, among creditors.  When those efforts failed, GTW ultimately stepped aside as operator of the Port.

12.     Seeing no viable restructuring alternative, Plaintiffs ultimately sold their Notes at fire sale prices, realizing losses in the tens of millions.

13.    Plaintiffs assert claims against the Defendants for violations of the TSA arising from their materially false and misleading statements and omissions to recover the damages they suffered due to Defendants' misconduct in soliciting, marketing, offering, and selling the Notes.

## PARTIES AND RELEVANT NON-PARTIES

14.    Plaintiffs are regulated annuity and life insurance companies based in Houston, Texas.  They offer a variety of life, property and casualty insurance products to millions of individuals and businesses across the United States and the world.  They collect premiums from their insureds in exchange for providing the foregoing insurance, and invest the premiums in instruments that, among other things, satisfy Plaintiffs' regulatory requirements and their risk/return criteria, and that are projected to provide sufficient reserves to pay anticipated claims. They are wholly owned and controlled subsidiaries of Corebridge Financial Inc. ("**Corebridge**"), and majority owned and controlled entities of American International Group, Inc.  Plaintiffs invested in the Notes in Houston, Texas, through their Texas-based investment advisor, AAM.

15.    Plaintiff American General Life Insurance Company (previously defined as "AGL") is a Texas corporation with its principal place of business in Houston, Texas.  AGL invested $50 million in the Notes.

16.    Plaintiff The Variable Annuity Life Insurance Company (previously defined as "VALIC") is a Texas corporation with its principal place of business in Houston, Texas.  VALIC invested $25 million in the Notes.

17.    Non-party AIG Asset Management (U.S.), LLC (previously defined as "AAM") served at all relevant times as the investment advisor to AGL and VALIC in connection with their purchase of the Notes.  AAM seeks to invest in securities that meet Plaintiffs' investment objectives and satisfy their regulatory obligations.  It is a wholly owned subsidiary of Corebridge.

18.     Defendant Pareto Securities AS (previously defined as "Pareto AS") is organized under the laws of, and headquartered in, Norway.  Pareto AS's website boasts that it is "a leading investment bank globally in . . . maritime and aquaculture," "the largest arranger of direct investments in shipping" in the Nordic countries, and "offers unique maritime technical and commercial expertise consulting services."  Notably, weeks before Pareto first solicited Plaintiffs' investment in the Port, it had completed a different financing with AAM for another maritime facility.

19.     Defendant Pareto Securities, Inc. (previously defined as "Pareto Inc.") is a Delaware corporation with its principal place of business in New York.  At all relevant times, it also had a physical office in Houston, Texas, its only other US office.  It is a direct, wholly owned subsidiary of Defendant Pareto AS.

20.     Non-party GT USA Wilmington, LLC (previously defined as "GTW" or "Issuer") is a Delaware LLC headquartered in Delaware.  GTW issued the Notes.

21.     Non-party Gulftainer Company Limited (previously defined as "Gulftainer") is headquartered in the United Arab Emirates.  It is the ultimate parent of GTW.

## PARETO AS CONTROLLED PARETO INC

22.     At all relevant times, Pareto AS directly controlled, and owned a 100% stake in, Pareto Inc., as set out in the latter's annual FINRA filings.[3]

23.     At all relevant times, Pareto Inc. has been a broker-dealer registered with the U.S. Securities and Exchange Commission and, on information and belief, registered in Texas under the TSA, where it has also had a physical office.

---

[3]  *See* https://files.brokercheck.finra.org/firm/firm_44734.pdf, at 7 (indicating that Pareto AS owns 75% of more of Pareto Inc., and indicating "yes" in response to the question "[d]oes this owner direct the management or policies of the firm?").

24.     Although Pareto Inc. nominally conducted the placement of the Notes, the true placement agent was Pareto AS, who directed and controlled Pareto Inc. as its agent.

25.     On or around January 14, 2019, the day the sale of the Notes was funded, GTW executed a "Flow of Funds" memorandum that provided, among other things, for payment of GTW's representatives in the transaction.  The memo was addressed to Pareto AS (among others), identified Pareto AS as the true advisor in connection with the sale, and directed payment of the placement agent fee to Pareto AS by way of a Pareto Inc. account.  An excerpt of the memorandum is below:

**4.       Payment of Advisors**

The Company shall also pay the fees, charges and disbursements of the advisors listed below, to the extent reflected in a statement of fees of each such advisor rendered to the Company and hereby instructs Wilmington Trust, National Association to pay such amounts from the Revenue Account.

**Pareto Securities AS**
Amount:          $700,737.79

26.     Moreover, Pareto AS controlled the manner, means, and details of the placement of the Notes, including Pareto's material misrepresentations and omissions outlined above and below, through its 100% ownership of Pareto Inc. and, on information and belief, through a contractual relationship with Pareto Inc.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because neither Plaintiff is a citizen of the same state as either Defendant, and the amount in controversy exceeds $75,000.

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

29.     The court has personal jurisdiction over Defendants because they transacted business relating to the causes of action alleged herein within the State of Texas, regularly conduct business in the State of Texas, committed tortious acts in the State of Texas, and committed tortious acts causing injury to persons or property in the State of Texas.  Plaintiffs' claims arise directly from Defendants' conduct in the state, including actions purposefully directed toward Texas, such that this Court's exercise of specific jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice.

30.     In particular, as detailed below, Defendants targeted and solicited investments in the Notes from Plaintiffs' investment team in Houston, Texas, knowing Plaintiffs' team was located there.  Defendants marketed the Notes to Plaintiffs in Texas, including through a roadshow at Plaintiffs' headquarters in Houston, with representatives for Pareto, GTW, and Gulftainer present.  Defendants also made misrepresentations to Plaintiffs in Texas, and conveyed other information related to the investment through the roadshow and by means of hundreds of documents, emails, and calls that Defendants knowingly directed into Texas.  Plaintiffs evaluated the Notes and the underlying transaction at their offices in Houston, Texas, where they eventually purchased the Notes.  Further, Plaintiffs' purchases were booked in records held by AAM at its offices in Houston, Texas, and the instructions to Plaintiffs' custodian banks to debit Plaintiffs' accounts to pay for the Notes were issued by AAM, also in Houston, Texas.  In addition, on information and belief, at all times relevant to this dispute, Pareto has been registered to do business in Texas, including as a registered dealer under the Texas Securities Act.  Pareto also has a physical office located in Houston, Texas.

## FACTUAL BACKGROUND

**I.     GTW WINS A 50-YEAR CONCESSION AGREEMENT TO OPERATE AND DEVELOP THE PORT OF WILMINGTON**

31.     The Port of Wilmington is a 300-acre, full service maritime facility located at the confluence of the Delaware and Christina Rivers in Wilmington, Delaware.  At all relevant times, it was the largest importer of fresh fruit in North America, and has the largest dockside cold storage facility in the country.  In 1995, the State of Delaware purchased the Port from the City of Wilmington and created the Diamond State Port Corporation ("**DSPC**") to own and operate the facility.

32.     In March 2017, DSPC announced plans to privatize the Port, and began soliciting bids for a public-private partnership to improve, develop, finance, and operate the Port and a nearby facility known as Edgemoor.  Gulftainer, the world's largest privately-owned port operator, formed GTW to submit a bid.

33.     In December 2017, DSPC selected GTW as its preferred bidder and executed an exclusive letter of intent to enter a concession agreement with GTW.  Following months of negotiations between GTW and DSPC—and, as Plaintiffs would later learn, also between GTW and MMS—the parties executed the Concession Agreement on September 18, 2018.

34.     Under the Concession Agreement, DSPC granted GTW a 50-year exclusive lease to commercially operate and develop the Port, and to build a new container terminal at Edgemoor. Among other things, the lease assigned to GTW all of DSPC's rights and obligations under its existing contracts with Port customers-, and granted GTW the right to use the Port to provide such revenue-generating services as stevedoring and container handling.  In return, GTW promised to pay DSPC a quarterly concession fee of at least $3 million and committed to implement more than $600 million of capital improvements within the first ten years, including (i) $40 million at the

10

Port in the first two years; (ii) $20 million in warehousing improvements at the Port in the first three years; and (iii) $250 million at Edgemoor by December 31, 2022.

## II.    GTW ENLISTS PARETO TO RAISE CAPITAL

35.    To meet these obligations, GTW sought to issue up to $350 million of the Notes. GTW enlisted Pareto to solicit interest in, market, offer, and sell such Notes.  On information and belief, GTW made Pareto's compensation for this contingent upon, at least in part, the completion and size of the ultimate capital raise.

36.    After the transaction funded, GTW paid Pareto AS for the successful completion of the sale and for its provision of services as placement agent for the Notes, using a portion of the financing raised to make the payment.

## III.   PARETO SOLICITS PLAINTIFFS TO INVEST IN THE NOTES

37.    On November 8, 2018, Pareto contacted AAM regarding a potential investment in the Port.  This was the first communication between the parties regarding the project.

38.    Over the next two months, Pareto directed numerous calls, emails, and documents, including solicitation and marketing materials regarding the Notes, to Plaintiffs in Houston, Texas.

39.    On December 6, 2018, at Pareto's request, representatives of Pareto, GTW, and Gulftainer, met in person at Plaintiffs' and AAM's offices in Houston, Texas, for a roadshow presentation regarding the Notes (the "**Roadshow**").  The purpose of the Roadshow was for Defendants to market the Notes to Plaintiffs, and to provide a "Financial Storyline" regarding the investment.  On information and belief, the Financial Storyline covered, among other topics, GTW's business plan and strategy, and its anticipated revenues and cost-savings from the Port.

40.    On December 11, 2018, Plaintiffs submitted to Pareto a bid for $75 million of Notes based on the information, materials, and representations provided or made by Pareto and specified

additional terms on which they would purchase the $75 million.  On December 12, 2018, Pareto emailed Plaintiffs that their bid, including its additional terms, had been accepted.

41.     From December 11, 2018 to January 14, 2019, the parties negotiated the terms of the financing documents, including the NPA.  Pareto continued to act for GTW in the negotiations.

42.     On January 14, 2019, the parties executed the financing documents, including the NPA, the transaction was funded, and Plaintiffs purchased $75 million in Notes.

## IV.   PARETO OFFERED AND SOLD THE NOTES BY MEANS OF MATERIALLY MISLEADING STATEMENTS AND OMISSIONS

43.     As Plaintiffs would later learn, Pareto had offered and sold the Notes to Plaintiffs by means of materially misleading statements and omissions.

### A.   Material False and Misleading Statements and Omissions Regarding Stevedoring Revenues at the Port

44.     Throughout its efforts solicit Plaintiffs' investment in and market, offer, and sell the Notes, Pareto consistently represented to Plaintiffs that GTW had secured the rights to all stevedoring revenues historically generated by the Port, and would receive those revenues in full for the 2019 fiscal year (January to December), and thereafter.

45.     For example, on November 15, 2018, Pareto distributed an Investor Presentation to Plaintiffs "to evaluate a potential purchase of senior secured notes … of GT USA Wilmington, LLC."  One slide, titled, "Historical Revenue Generation by DSPC," represented that DSPC had "historically outsourced main parts of port operations such as container handling and stevedoring to third parties," and thus that DSPC's revenues were low compared to the total volume of cargo coming through the Port.  This slide misleadingly implied that GTW would generate substantially more revenues because it would operate for itself—rather than outsourcing—the revenue-generating functions at the Port, including all stevedoring.

46.     The Presentation also misleadingly suggested that GTW was now positioned to operate the container handling and stevedoring functions for all customers at the Port, and therefore to generate the associated revenues for itself: "The underlying customer base will furthermore diversify further [sic] post commencement of the Concession Agreement due to a change in business model, ***with GT USA handling all operations including container handling and stevedoring***." (Emphasis added). Another slide compared historical revenues generated at the Port in 2017 (including by such third parties as MMS) to estimated first and second year revenues for GTW, incorporating the assumption that GTW would capture all existing stevedoring and container handling revenues that were previously outsourced to third parties—***including*** the revenues generated by MMS.

47.     Similarly, in a November 30, 2018 email exchange with Plaintiffs, Pareto misleadingly suggested that GTW was taking over MMS. In response to a question about "GTs [Gulftainer's] ability to take costs out of the business," Pareto stated that GTW expected to generate more than $23 million in cost savings by consolidating operations at the Port, including by reducing the number of employees staffed by MMS, eliminating the "current 20% mark[] up on labour cost by MMS charging Dole and Chiquita under a cost plus model," and reducing by 30% the amount of overtime that MMS had been paying. Of course, GTW could hardly accomplish this substantial cost saving unless it acquired MMS and its existing contracts with Dole and Chiquita. Yet by November 30, 2018, GTW had instead repudiated its contract to purchase MMS and was being sued for tens of millions of dollars for doing so.

48.     On December 9, 2018, Plaintiffs exchanged another round of written questions and answers with Pareto. Among other things, Plaintiffs asked:

> How many of the existing Port customers have signed on for services at the Port that are now offered by GT USA Wilmington that were not being handled by DSPC (such

as container handling and stevedoring)? Trying to reconcile the chart on page 21 of the Investor Presentation with the revenue expected in year one of the model. What business lines will the Company continue to face competition on and what is the expected contribution to revenue from these businesses?

49.     In response, Pareto stated:

***GT will take over all cargo operation at the port which is the current DSPC revenue of $42m as well as stevedoring revenue currently undertaken by mainly MMS and DRS of $48m*** excluding the various labor items passed through to consignees. The new container handling tariff implemented will see a net increase of 10% in revenue over and above the current baseline in return for substantial improvements in operational efficiencies which will save customers other cost." (emphasis added).

50.     Pareto's December 9, 2018 response was materially misleading because it omitted that GTW had repudiated the contract to purchase MMS—through which it had planned to capture the overwhelming majority of the $48 million in stevedoring revenues—and that it was in fact embroiled in a lawsuit filed by MMS for breach and repudiation of that very agreement seeking tens of millions of dollars.[4]

51.     Similarly, Pareto's failure to disclose the MMS Action rendered several statements in the NPA itself false and misleading.  For instance, Section 5.6 stated that GTW "does not have any material liabilities that are not disclosed in the Disclosure Documents."  And Section 5.8 represented that "[t]here are no actions, suits, investigations or proceedings pending . . . against or

_____

[4] On information and belief, GTW sought to solve this issue, and to capture the stevedoring revenues generated by, at least, the Port's two biggest stevedoring customers—Dole and Chiquita—by persuading them to breach their contracts with MMS by underselling the prices (and attendant revenues) that they agreed to pay MMS.  GTW failed to disclose this backup plan—or the need for any backup plan at all.  Nor could this "loss-leader" strategy—which relied on, among other things, losing (not making) money to service the needs of Dole and Chiquita, support Pareto's statements that GTW would be acquiring $48 million of revenue-generating stevedore operations.  Rather, Pareto's failure to disclose that GTW had repudiated its contract to purchase MMS, and had chosen instead to rely on an unprofitable scheme to lure away MMS' customers, made its revenue-related statements materially misleading.

affecting the Company or any property of the Company in any court . . . that could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect."

52.     These representations were also materially misleading because Pareto did not disclose the MMS Action, which carried a potential liability of up to $30 million (and ultimately an *actual* liability of $21 million, plus millions of legal fees incurred in defense costs).  There is no question that such a potential liability is material to a reasonable investor, and it was certainly material to Plaintiffs given their detailed inquiries, particularly given the substantial portion of revenues that might be required to fund this single liability and the subject matter of the suit, which would have put the lie to statements that GTW was acquiring all the stevedoring revenue previously generated by MMS.

**B.     Material False and Misleading Statements and Omissions Regarding the Reliability of the Information Provided**

53.     Pareto also represented on multiple occasions that it believed the information and materials provided in connection with the sale of the Notes were reliable.

54.     For example, the Investor Presentation represented that "[t]he information contained in this Presentation was obtained from sources believed to be reliable."  It also noted that GTW had "agreed to indemnify [Pareto] with respect to … any liability for any material misstatements or omissions in this Presentation," suggesting that Pareto had allocated risk in a way that made it comfortable in putting its brand on the representations therein.

55.     Likewise, a Confidential Investor Memorandum ("**CIM**") provided by Pareto and stamped with Pareto's name as "Sole Placement Agent" dated November 2018 stated that it was "based upon information supplied by the Issuer or other sources that is believed to be reliable and is being furnished through Pareto Securities Inc. as authorized placement agent."  Similarly, it provided that "ANY FINANCIAL AND OPERATING PROJECTIONS THAT MAY BE

CONTAINED IN THIS CIM HAVE BEEN BASED ON ASSUMPTIONS THAT WE BELIEVE

TO BE REASONABLE."  It also stated that the "[p]rojected financial results herein are consistent

with industry standard practices."

56.     These assertions were false and misleading when made.  Pareto's assertions that the

information in the above documents was "reliable" necessarily implied to any reasonable investor

that Pareto—a global leader in maritime and cargo-related investment banking—had applied its

touted expertise to perform sufficient and competent investigation and diligence on the information

supplied by GTW to support Pareto's asserted belief that such information was reliable.  The

apparent significant failures in Pareto's processes make clear that Pareto had failed to do much of

any homework, rendering its statements about reliability—even if honestly believed—materially

misleading.

### C.     False and Misleading Statements and Omissions Regarding Use of the Proceeds

57.     Pareto repeatedly represented to Plaintiffs that the proceeds of the Notes would be

used to fund GTW's capital expenditure obligations under the Concession Agreement.  The CIM

represented, for instance, that "[p]roceeds from the issue of the Notes (net of issuance costs and

expenses) will be used to fund construction costs of the planned expansion of the Port Facilities."

In reality, on information and belief, the Note proceeds were not devoted to value-enhancing

capital expenditures, but were instead used to mask revenue shortfalls and to cover up operating

losses, including as a result of GTW's own repudiation of the MMS contract and the subsequent

litigation costs incurred due to the MMS lawsuit, none of which was ever disclosed.

58.     In other words, rather than use Plaintiffs' investment to improve the Port and

Edgemoor, and thereby generate additional revenues to service its debt—as Plaintiffs understood

GTW would do—GTW instead put the funds to non-constructive and non-revenue-generating uses

to benefit itself.  In light of GTW's repudiation of the MMS Contract and the pending MMS Action against GTW, Pareto either knew or was careless in not knowing that its repeated statements regarding the purpose of the Note proceeds were misleading.  It also knew or was careless in not knowing that information about how the proceeds of the Notes would be used would be important to any reasonable investor, including Plaintiffs.  Pareto's statements regarding the way the proceeds would be used were materially false, and omitted material facts necessary to make those statements not misleading.

59.     On January 14, 2019, based in no small part on the foregoing misrepresentations and omissions, Plaintiffs purchased the Notes.

## V.    GTW SIGNIFICANTLY UNDERPERFORMS PROJECTED REVENUES AND DEFAULTS UNDER THE NPA

60.     Soon thereafter, GTW began to significantly underperform its projected revenues. Pareto and GTW had forecasted 2019 revenues and EBITDA to be $115 million and $35 million, respectively, but actual revenue was $61 million and EBITDA was negative $5.5 million.

61.     GTW did so poorly, in fact, that in November 2019—*less than a year* after Plaintiffs had settled their Note purchase transaction—GTW sent a letter to Plaintiffs by overnight mail alerting them that GTW would default on its debt service ratio covenants under the NPA, and requested a waiver and amendment of those provisions.  Although Plaintiffs agreed to the waiver, the defaults continued.  Over the next three years, GTW defaulted on various financial and other covenants including, among other things, failing to pay costs and expenses incurred in connection with the NPA amendments and waivers GTW had requested, failing to make an interest payment due on the Notes at the end of 2021, and failing to deliver audited financial statements for the year ending December 31, 2021.

## VI.   PLAINTIFFS UNCOVER THE MMS ACTION AND GTW'S EXPOSURE TO TENS OF MILLIONS IN POTENTIAL DAMAGES AND LEGAL FEES

62.     Due to GTW's repeated defaults and substantial underperformance, as discussed above, it became apparent that GTW would also default on its capital expenditure obligation under the Concession Agreement to expend $250 million by December 31, 2022.

63.     Plaintiffs therefore undertook additional investigations into GTW's performance, including a review of detailed, real-time financial statements to which Plaintiffs were entitled under the information covenants of the NPA.  During this review, Plaintiffs noted that GTW had incurred significant legal expenses, and allocated for substantially more going forward.  This prompted Plaintiffs to inquire into why GTW was accruing such substantial legal fees.  As a result of the inquiry, in or around early 2022, Plaintiffs learned for the first time of the MMS Action, of GTW's potential liability of well over $20 million, and that GTW was then alleged (now confirmed) to have repudiated the MMS Contract.

64.     In September 2022, the Delaware Court of Chancery awarded a $21 million judgment against GTW in the MMS Action. The Delaware court concluded, among other things, that (i) in July 2018, GTW and MMS executed a binding letter agreement, pursuant to which GTW promised to acquire MMS for fair market value, which was to be determined by an independent valuation conducted by KPMG; (ii) alarmed by KPMG's valuation of well over $20 million, GTW set out to obstruct KPMG's work and to prevent it from finalizing its valuation; and (iii) on September 3, 2018, GTW breached and repudiated the MMS Contract by informing MMS without cause that it "consider[ed] the [MMS Contract] to be substantially frustrated and therefore terminated."

## VII.   PLAINTIFFS SELL THEIR NOTES AT A FRACTION OF PRICE PAID

65.     The September 2022 judgment in the MMS Action was the nail in the coffin for GTW because GTW was already on the brink of defaulting on its capital expenditure obligation under the Concession Agreement.  GTW's inability to generate revenues sufficient to service its existing debt, let alone raise hundreds of millions more, was now a certainty.  The default under the Concession Agreement (which in turn caused a cross default under the NPA) marked the end of GTW's ability to operate the Port, and it instead sold substantially all of its assets to a third party with the approval of DSPC.

66.     On June 8, 2023, the DSPC (as the counterparty to the Concession Agreement) announced that Enstructure LLC would be the new Port operator and would acquire the assets of GTW.  In July 2023, all noteholders sold their $75 million Notes for $30 million, which was the highest offer available, resulting in a substantial loss on their investment in the tens of millions.

<u>CAUSE OF ACTION</u>
**For Violations of the Texas Securities Act, Tex. Gov't Code §§ 4008.052, 4008.055**
**(Against all Defendants)**

67.     Plaintiffs incorporate herein all prior and subsequent allegations of the complaint.

68.     This cause of action is brought pursuant to Section 4008.052 of the Texas Securities Act, for damages in connection with the offer and sale of the Notes to Plaintiffs.  Accordingly, Plaintiffs need not show scienter, reliance, or loss causation, which are not elements of a claim under Section 4008.052.

69.     As set forth above, Pareto offered, marketed, and sold the Notes to Plaintiffs by means of materially misleading statement and omissions.

70.     Defendant Pareto sold, or acted as the seller's agent, and successfully solicited Plaintiffs' purchase of the Notes, motivated at least in part by a desire to serve its own financial

interests or those of the securities owners and issuers, including GTW and its parent, Gulftainer. Thus, Pareto was a statutory seller under Tex. Gov't Code § 4008.052.

71.     At all relevant times, Defendant Pareto AS directly and indirectly controlled Pareto, including in Pareto's capacity as a statutory seller under the TSA, pursuant to Tex. Gov't Code § 4008.055.  Pareto AS owns 100% of the equity of Pareto, and has the ability to direct the management and/or policies of Pareto.  Through Pareto AS's control of Pareto, it had the power to cause Pareto to sell, offer to sell, solicit investors for, market, and to cease from selling, offering, soliciting, and marketing, the Notes to Plaintiffs.  Thus, Defendant Pareto AS, as control person of Pareto, marketed, offered, and sold the Notes to Plaintiffs by means of untrue statements of material fact and omissions of material facts that were necessary to make the statements made not misleading.

72.     The untrue statements and omissions of material fact were material because there is a substantial likelihood that a reasonable investor deciding whether to purchase the Notes would have viewed them as important to their decision and as substantially altering the total mix of information available, as alleged above.

73.     Defendants sold the Notes to Plaintiffs in Texas.

74.     At the time Plaintiffs purchased the Notes, they did not know of these untruths and omissions.

75.     As a result of the materially false and misleading statements and omissions alleged herein, Plaintiffs are entitled to damages pursuant to Tex. Gov't Code § 4008.057, in an amount to be calculated at trial.

76.     Because Plaintiffs were required to retain counsel to prosecute this action, they are entitled to an award of costs and reasonable attorneys' fees, pursuant to Tex. Gov't Code § 4008.060.

77.     The provisions of the Texas Securities Act apply as there is a substantial nexus between Defendants' conduct with respect to the false and misleading statements and the State of Texas.  Among other things, as alleged above, Defendants distributed the offering materials to Plaintiffs in Texas, and communicated many of the false and misleading statements to Plaintiffs in Texas, for the purpose of inducing Plaintiffs to invest in the Notes.  Moreover, Plaintiffs suffered injury in Texas, including because Plaintiffs decided to buy the Notes, and communicated that decision to Defendants, from Texas, and because the Notes are accounted for on Plaintiffs' books and records in Houston, Texas.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray for relief as follows:

1.     An award of damages in favor of the Plaintiffs against the Defendants, jointly and severally, as provided under Tex. Gov't Code § 4008.057(a), in an amount to be determined at trial, but no less than the consideration Plaintiffs paid for the Notes ($75 million) plus interest on the consideration at the legal rate from the date Plaintiffs paid the consideration on January 14, 2019, *less*: (a) the amount of any income Plaintiffs received on the security, and *less* (b) the greater of: (i) the value of the Notes at the time Plaintiffs sold them; or (ii) the actual consideration received for the Notes at the time Plaintiffs sold them.

2.     Awarding Plaintiffs costs and expenses in connection with this litigation, including but not limited to their attorneys' fees, expert fees, and other costs and disbursements;

3.     Awarding Plaintiffs prejudgment and post-judgment interest; and

4.     All other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED:    Houston, Texas
             November 30, 2023

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: */s/ Christopher Porter*
    Susheel Kirpalani (*pro hac vice forthcoming*)
    Jesse Bernstein (*pro hac vice forthcoming*)
    Jacob J. Waldman (*pro hac vice forthcoming*)
    51 Madison Avenue, 22nd Floor
    New York, New York  10010-1601
    Telephone:  (212) 849-7000
    Fax:  (212) 849-7100
    susheelkirpalani@quinnemanuel.com
    jessebernstein@quinnemanuel.com
    jacobwaldman@quinnemanuel.com

    Christopher Porter
    Texas Bar No. 24070437
    Daniel B. Myerson (*application pending*)
    Texas Bar No. 24134916
    QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
    711 Louisiana Street, Suite 500
    Houston, TX 77002
    Telephone:  713-221-7000
    christopherporter@quinnemanuel.com
    danielmyerson@quinnemanuel.com

    Solace Kirkland Southwick
    Texas Bar No. 11522150
    ssouthwick@hoganthompson.com
    Hogan Thompson Schuelke LLP
    1001 Fannin Street, Suite 4775
    Houston, Texas 77002
    Telephone: (713) 671-5630
    Facsimile: (713) 671-5632

    *Attorneys for Plaintiffs*